**In re SUNCOAST AIRLINES, INC., Debtor.**

**ATKINSON & MULLEN TRAVEL, INC., d/b/a Apple Vacations, Plaintiff–Counterdefendant,**

v.

**SUNCOAST AIRLINES, INC., Defendant/Counterplaintiff.**

**Bankruptcy No. 88–00028–BKC–AJC. Adv. No. 88–0201–BKC–AJC–A.**

United States Bankruptcy Court, S.D. Florida.

April 12, 1989.

---

Lawrence A. Kellogg, Tew Jorden Schulte & Beasley, Miami, Fla., for Atkinson & Mullen Travel, Inc.

Andrew J. Nierenberg, Coral Gables, Fla., for SunCoast Airlines, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. JAY CRISTOL, Bankruptcy Judge.

This matter was tried before the Court on March 9, 10, 16, and 24, 1989, upon the Complaint filed by the Plaintiff, Atkinson & Mullen Travel, Inc., d/b/a Apple Vacations ("Apple") against the Debtor/Defendant, SunCoast Airlines, Inc. ("SunCoast"), and SunCoast's counterclaim against Apple. Having considered the evidence, having observed the candor and demeanor of the witnesses, having considered argument of the parties, and otherwise having been fully advised in the premises, the Court makes the following findings of facts and conclusions of law:

### Procedural Background

1. On January 5, 1988, SunCoast filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. On April 21, 1988, Apple filed a Complaint against SunCoast seeking to recover funds contained in an interest-bearing escrow account maintained by SunCoast and to establish its pre- and post-petition claims for funds due and owing from SunCoast. On July 15, 1988, SunCoast filed an Answer and Counterclaim alleging over $400,000 in damages arising from Apple's alleged breach of contract. At trial SunCoast abandoned several of its defenses, as well as several major elements of the damages originally alleged in the counterclaim, and did not present any evidence in support of such elements.

### Findings of Fact

2. Apple is a large, well-established tour operator located in a suburban area outside of Philadelphia, Pennsylvania. As a part of its business, Apple creates various "packaged tours" providing air transportation, hotel accommodations, and other necessities and amenities to the vacationing public. Due to its geographic location, an important part of Apple's business consists of arranging vacation packages scheduled during the winter and spring months for weather-weary Northeasterners seeking sunnier climes. As a result, Apple must utilize the services of various charter and/or commercial airlines to transport passengers to Jamaica, Mexico and other tropical destinations.

3. Prior to the filing of its Chapter 11 Petition, SunCoast provided charter passenger airline service, among other services. SunCoast was located in Fort Lauderdale, Florida.

4. In the late summer of 1987, Apple and SunCoast began discussions concerning the possible establishment of a charter program servicing the Caribbean and/or Mexico to begin in late 1987 and to run until the spring of 1988. Apple also engaged in discussions with other charter airlines about the establishment of similar programs. Mr. Ted Papps, Apple's Vice President in charge of marketing, was directly in charge of the negotiations concerning these proposed charters.

5. Apple undertook these negotiations with two primary considerations in mind. First, the marketing of any charter to the Caribbean or Mexico would be greatly facilitated if the program could be promoted by Apple as offering non-stop airline service from Philadelphia or Baltimore. The availability of non-stop service is often a major factor considered by potential tour passengers when considering tour packages. Apple's second concern was the passenger capacity of the aircraft offered by the charter airline. Apple felt it could maximize the efficiency and profitability of its tour program if the aircraft had a capacity of approximately 150 passengers.

6. As discussions with the various charter airlines continued, it became apparent to Apple, based upon the representations made by SunCoast, that SunCoast would probably be best able to satisfy the goals set by Apple for the proposed charters. Specifically, SunCoast represented to Apple that SunCoast would be subleasing a Boeing 737–300 jet aircraft and would obtain possession of the 737–300 in mid-fall of 1987, well before the anticipated beginning date of Apple's proposed charters, which was the weekend before Christmas 1987. The 737–300 aircraft could fly to Jamaica and Mexico non-stop from Philadelphia, and had a 148 seat passenger capacity.

7. Mr. Herbert C. Keilson, then Vice President in charge of marketing for SunCoast, was the principal negotiator for SunCoast. Any agreement that might be reached, however, would be subject to the approval of SunCoast's Chairman and Chief Executive Officer, Byron G. Ellison. As a result of extensive negotiations between Mr. Papps and Mr. Keilson, and in reliance upon the representations made by SunCoast concerning the imminent availability of the 737–300 aircraft, on September 7, 1987, Apple entered into a Passenger Aircraft Charter Agreement ("Agreement") with SunCoast for charter air transportation on a 148 seat, 737–300 aircraft. The Agreement provided for weekly round trip flights, four days a week, to four different vacation destinations. These scheduled flight routes under the Agreement are summarized as follows:

| Charter Route | Day of Week | First Flight | Last Flight |
|---|---|---|---|
| (a) Philadelphia to Baltimore; Baltimore to Acapulco, Mexico; Acapulco to Philadelphia; Philadelphia to Baltimore. | Friday | 12/25/87 | 04/29/88 |
| (b) Baltimore to Philadelphia; Philadelphia to Puerto Vallarata, Mexico; Puerto Vallarata to Baltimore; Baltimore to Philadelphia. | Saturday | 12/19/87 | 04/30/88 |
| (c) Philadelphia to Montego Bay, Jamaica; Montego Bay to Philadelphia. | Sunday | 12/20/87 | 05/01/87 |
| (d) Philadelphia to Zihuatanejo, Mexico; Zihuatanejo to Philadelphia. | Monday | 12/21/87 | 05/02/87 |

8. Both the southbound and northbound "legs" of each flight route would carry passengers: the southbound flights would carry newly departing vacationers, while the northbound flights would return well-tanned vacationers who had arrived in their chosen tropical paradise the week before.

9. The price to be paid by Apple for each of the round trip flights was a set, flat rate (sometimes colloquially referred to in the industry as "the bird price") which varied for each destination and was not to be adjusted downward for any unused capacity by Apple. On the other hand, SunCoast was obligated to provide a minimum of 148 seat capacity and, when it could not do so, it acquiesced to provide "off-space seating" on other charter or commercial airlines for Apple's passengers. SunCoast was the party to bear the cost of any off-space seating necessary.

10. On October 13, 1986, SunCoast executed a charter trip depository agreement as mandated by the Department of Transportation. Pursuant to the terms of the Agreement between Apple and SunCoast, Apple was required to wire payment to this account at SunCoast's depository bank, First American Bank & Trust, 15 days prior to each flight's departure.

11. Under the Agreement, Apple was also obligated to establish a $75,000 security deposit, in the form of a letter of credit. During the trial of this case, SunCoast originally maintained that Apple had been required to establish a $300,000 security deposit, $75,000 for each of the four destinations, but later explicitly abandoned this position. Apple properly established the $75,000 line of credit.

12. The Passenger Aircraft Charter Agreement was duly executed on September 7, 1987, by Mr. Papps and Mr. Ellison on behalf of Apple and SunCoast, respectively.

13. After September 7, 1987, but prior to the scheduled beginning of the charter program, Mr. Papps repeatedly asked SunCoast whether the 737–300 aircraft would be available for the start of Apple's charter program. At first, Mr. Papps was unequivocally assured that the plane would be available and ready to fly by December 19, 1987, the scheduled start up date. Later, as that date drew nearer, Mr. Keilson and Mr. Ellison began to hedge on this issue, claiming that crew training problems might require that SunCoast fly the first weekend sequence of flights (December 19, 20 and 21) with one of its two other planes, both of which were Boeing 727's with 129 seat capacity.

14. Unbeknownst to Mr. Papps, or anyone else at Apple, the true reason for SunCoast's inability to provide the 737–300 aircraft for the first sequence of flights would prove to be far more serious than mere crew training delays. The 737–300 aircraft which SunCoast intended to use for the Apple charters was of British registry. In order to fly the aircraft out of this country, the aircraft had to be registered with the Federal Aviation Administration. For reasons that are in dispute and are the subject of substantial state court litigation currently pending involving SunCoast and two other parties, this registration was not properly effected.

15. Wherever fault ultimately may be determined to lie in the pending state court action, it is clear that between Apple and SunCoast:

a. SunCoast never provided the 737–300 aircraft it originally intended to utilize;

b. SunCoast never obtained another 737–300 or other comparable aircraft from any other source; and

c. Apple was in no way responsible for SunCoast's failure to provide a 737–300 or other comparable aircraft.

16. SunCoast, through Mr. Keilson and Mr. Ellison, mislead or failed to disclose to Mr. Papps and Apple the true status of the 737–300 aircraft until well after Christmas, 1987.

17. The origins of this lawsuit arise most directly from SunCoast's failure to obtain the 737–300 aircraft and its continuous, unwarranted misrepresentations to Apple concerning the matter. In fact, if SunCoast had been more truthful up front, the program might have been salvaged based upon the demonstrated good faith and the willingness to extend itself evidenced by Apple. Instead, from this point onward, the evidence clearly and convincingly shows that while Apple performed in good faith and beyond its contractual obligations, SunCoast continuously acted in

bad faith and failed to perform its obligations.

18. Without the 737–300 aircraft, SunCoast attempted to fly the Apple program with a 129 seat Boeing 727 aircraft. The use of this aircraft caused immediate problems for the parties. First and foremost, the lesser capacity of the 727 (some 19 seats less than the 737–300) created a continual need for the off-space seating of excess passengers on other charter or commercial airlines. At trial, SunCoast, through Mr. Ellison, admitted that it was SunCoast's responsibility to obtain and pay for this off-space seating.

19. Despite its obligations to obtain and pay for the off-space seating, SunCoast often did not display the ability or inclination to do so. Instead, going beyond its own obligations, and for the sake of its passengers, Apple frequently obtained and paid for the off-space seating itself. In at least one instance, even when SunCoast did locate off-space seating on another charter airline, Apple was forced to make all the necessary arrangements and payments for the seating, since the off-space carrier refused to deal with SunCoast.

20. In order to reimburse Apple for the cost of this off-space seating, the parties agreed that whatever funds were expended by Apple to pay for off-space seating could be deducted by Apple from its scheduled payments into SunCoast's depository account at First American Bank & Trust. This matter was conclusively proven by the testimony of witnesses, the accounting records of the parties, and the correspondence of SunCoast, both internal and those sent to Apple, including documents signed by Mr. Keilson and Mr. Ellison.

21. Prior to the filing of SunCoast's bankruptcy petition, Apple had expended $135,527.59 on off-space seating that was eventually credited against payments into the depository account that were not made until after bankruptcy. After being told by SunCoast that the offsetting of the pre-petition obligations of SunCoast against the post-petition payments by Apple was improper under the Bankruptcy Code, Apple "unwound" these transactions bridging the petition date, and repaid SunCoast the $135,527.59 which had been deducted from the post-petition payments. As a result, since Apple paid for pre-petition off-space seating that should have been paid by SunCoast, but received neither a payment nor a credit from SunCoast for the cost of this seating, Apple has an allowed unsecured claim against the bankruptcy estate of SunCoast for $135,527.59.

22. Shortly after the commencement of the charter flights, and by the mutual consent of the parties, it was agreed that the Acapulco portion of the tour program would be cancelled, with the possibility that this portion might be resurrected at some later time. This was never done, and SunCoast expressly disclaimed whatever cancellation fees it might claim, if any, for the cancellation of the Acapulco program.

23. From the outset of the program, the weekly sequence of charter flights became a continuing and wholly unwarranted ordeal for Apple. The Court, in fact, is shocked by the manner in which SunCoast abused Apple. SunCoast established an almost predictable pattern of springing extortionate "Friday night surprises" upon Apple, demanding cash wires or even hand deliveries of cash, threatening not to fly that weekend's sequence of flights without these wires or payments. In at least one instance, SunCoast's demand for cash was based solely upon its own need to purchase fuel. Apple, faced with the prospect of stranding its northbound passengers in Mexico and Jamaica, had little alternative but to go forward under these coercive circumstances and make the payments demanded by SunCoast.

24. After manifesting extraordinary patience, an abundance of good faith, and a willingness to meet and even exceed its contractual obligations, Apple was finally pushed too far by SunCoast's continuing bad faith demands upon it. In the words of one witness, Mr. Ray Daley, Apple's Executive Vice–President, on February 12, 1988—faced with yet again another Friday night surprise by SunCoast—Apple took the position that "enough is enough". Unable to meet the payment demands made

by SunCoast, Apple made alternative arrangements for its passengers scheduled to fly that weekend. SunCoast never flew for Apple again.

25. Subsequent to the filing of SunCoast's Chapter 11 petition, Apple had paid $278,961.00 into SunCoast's depository account for flights that were never flown by SunCoast. A portion of this $278,961.00, and its subsequently accrued interest, constitutes the entire *res* of the escrow account at issue in this case.

26. On March 7, 1988, SunCoast improperly drew upon a letter of credit established by Apple, in the amount of $7,881.15. In doing so, SunCoast improperly certified that Apple was in default of its obligations to SunCoast. Although the Court directed SunCoast to deposit the $7,881.15 in the escrow account pending the outcome of this action, SunCoast did not do so.

27. The Court finds that the testimony of Mr. Papps, Mr. Daley, Mr. Keilson and Mr. John Mullen, Apple's president, to be credible.

28. The Court finds the accounting data supplied by Apple to be exhaustive and accurate, thoroughly documenting the actual relationship of the parties as it existed between the parties at the time of question.

29. The Court finds that Apple proved its case by clear and convincing evidence. The Court also finds that SunCoast introduced no evidence to support its First and Second Affirmative Defenses, and has not carried its burden of proving its remaining affirmative defenses. Further, the Court finds that SunCoast did not prove its counterclaim, and in fact presented no evidence to support its allegation that it incurred "substantial expense" in Mexico in reliance upon Apple's representations, or that it suffered "cancellation penalties" in Mexico due to Apple's refusal to deal further with SunCoast.

## CONCLUSIONS OF LAW

30. SunCoast initially breached the contract with Apple by failing to provide a 737–300 aircraft. If SunCoast could not lease the 737–300 originally intended, it was SunCoast's obligation to obtain another, or similar, aircraft from other sources. It did not do so.

31. Apple performed or at least substantially performed its contract with SunCoast, and often, as demonstrated by its efforts to obtain off-space seating, clearly exceeded its obligations. *See, e.g., Viking Communities Corp. v. Peeler Construction Co.*, 367 So.2d 737, 739 (Fla. 4th DCA 1979) (doctrine of substantial performance is recognized in Florida). In contrast, SunCoast repeatedly breached the contract, and the numerous modifications agreed to by the parties, thus frustrating the efforts of the parties. The non-breaching party to a contract has no duty to further perform the contract. *In re Auto Dealer Services, Inc.*, 65 B.R. 681, 684 (Bankr.M.D.Fla.1986) and cases cited therein. Apple nevertheless continued in good faith to attempt to do so, but finally, and justifiably, stopped due to SunCoast's abuses of Apple's good faith.

32. Apple acted in the best of good faith throughout its relationship with SunCoast. SunCoast acted in bad faith, repeatedly and shockingly.

33. SunCoast's contentions concerning Apple's failure to make a written or oral notification of default are wholly without merit. As stated by Mr. Mullen, Apple was doing everything it could to make the program work, and that in a spirit of cooperation it was not appropriate to threaten SunCoast with contractual violations. The Court agrees. It is doubtful that on that certain fateful night on the Titanic, the passengers were making written or oral notices of default concerning their contracts of passage; they were more interested in cooperating with the crew on launching the life boats. Because of SunCoast's actions, a similar situation existed here.

34. The equities in this case are with Apple and against SunCoast. Apple was up front and on the table with SunCoast. SunCoast was not up front, but instead acted in an evasive, inequitable, misleading and unconscionable manner towards Apple. The Court is shocked by the manner in which SunCoast abused Apple.

35. The Apple case was proven by clear and convincing evidence. Moreover, every point, every nuance, every issue that was not made and developed by Apple on direct examination was made, confirmed and in some instances, reinforced by the extensive cross-examination conducted by SunCoast without said examination ever adversely affecting Apple's case or making a point for SunCoast.

36. The SunCoast case, on the other hand, was without substance and consisted of nit-picking about inconsequential matters, in an apparent attempt to use hindsight to explain events which were clearly understood at the time of their occurrence. Most if not all of SunCoast's purported objections to the relationship with Apple came only after the litigation commenced and, in some instances, perhaps, only after trial began. The Court can only characterize the proposed defenses and counterclaim of SunCoast as sheer legerdemain.

37. As a result of the foregoing, the Court finds that Apple is entitled to the following:

(i) immediate payment of all monies in the escrow account including all accrued interest;

(ii) allowance as an administrative expense for all monies paid subsequent to SunCoast's bankruptcy for flights not flown by SunCoast, but which are not contained in the escrow account;

(iii) allowance as an administrative expense a claim for $7,881.15, representing the amount of the letter of credit improperly drawn upon by SunCoast; and

(iv) allowance of an unsecured claim against SunCoast Airlines, Inc. to the extent of $135,527.59. A separate final judgment implementing these findings shall be entered forthwith.

DONE and ORDERED.